Complainant brings this suit praying that a deed, executed by complainant to defendant Hammond, be declared a mortgage, and that he be allowed to redeem the premises. *Page 260 
This matter has been passed on by the court of errors and appeals in 101 N.J. Eq. 287, on a motion to dismiss the bill; and it was there decided that on the allegations of the bill complainant was entitled to relief. The suit has now been heard on final hearing and the question now before the court is whether complainant has established the allegations in the bill, which, on a motion to dismiss, were taken to be true.
I do not consider that complainant has established certain of the material allegations necessary to make out a case. There is an issue of fact as to the essential element of notice alleged to have been given to defendant Kraus. In addition, documentary evidence seems to show that the agreement concerning the premises in question is at variance with the allegations of the bill.
Certain of the facts are undisputed. In December, 1922, complainant conveyed the premises by a deed absolute on its face, to defendant Hammond. Hammond was the vice-president of the Greenwich Bank of New York City, to which complainant was indebted. Hammond paid nothing for the property and the conveyance to him was concededly made for the benefit of the bank. In February, 1926, Hammond made a contract with defendant Kraus for the sale of the premises for the sum of $20,000, title to pass on or before the 28th day of April, 1926. Soon after the signing of the contract, Kraus started work for the construction of a building on the premises, and title was closed on the 17th day of April. At the time complainant was indebted to the bank on a note for approximately $34,000, which was not then due, but was one of a series of notes which the bank had been renewing for some time from month to month. Kraus proceeded to put very valuable improvements on the premises.
Complainant's right to redeem against Kraus depends upon the establishment of two conditions, first, that the transaction between complainant and the bank, together with Hammond as its representative, was in equity a mortgage, and, second, that Kraus had sufficient notice of complainant's rights. As to a recovery against Hammond, only the first question is to be considered. *Page 261 
Complainant gave to Hammond a deed absolute on its face. The bill alleges as follows:
"6. That at the time said conveyance was made by complainant to the defendant Frank Hammond, an agreement was made between them that the said premises would be reconveyed to complainant upon the payment by him to the Greenwich bank of the moneys due from complainant to said bank."
Complainant testified that these dealings were with Mr. Ford, the president of the bank, now dead. He said that Mr. Ford asked for additional collateral and that he provided it by assigning certain contracts and certain stock together with the deed in question. He says that the agreement was that the deed was to be returned to him when he took up his obligation at the bank. Subsequently the bank sold some liberty bonds deposited for collateral for approximately $9,000 and reduced complainant's obligation by that amount. Complainant never paid the bank the proceeds of any of the assigned contracts, although he collected large sums from the debtors.
In October, 1925, complainant wrote the bank that he had had several offers for the property and that he was inclined to recommend that they accept one which would net $9,000. The bank replied that the property should bring more. On December 8th, 1925, the bank wrote the complainant:
"We wish to inform you that we have instructed a real estate agent to offer the property at Englewood, which is in Mr. Hammond's name, for sale to net $12,000."
He replied on December 10th, 1925:
"In regard to the property, as I now see the situation, it would be a grave mistake to sell at the present time, for two reasons. One is that all property in Bergen county will jump from two to three times its present value as soon as the contract for the new bridge is let. This piece is especially well situated and I consider it very choice, and I am firmly of the opinion that in a little time, enough can be realized from it to pay my whole indebtedness to you.
"The other reason, which has been brought home to me, is that the present state of affairs, which while it fully protects you, at the same time prevents an attack upon me before I am far enough along *Page 262 
to properly handle it. It would be putting me in a vulnerable position, unnecessarily, to reduce my obvious debt to you. I therefore urge that we take this property off the market for the present, and watch developments. I am fully committed to the task of paying, not only you, but every creditor, even to the smallest, and I am sure as I always have been, that I can have your co-operation and protection, as far as you can grant it to me."
These two letters seem to me to be highly significant, as they seem to fully recognize the right of the bank, acting through Mr. Hammond, to sell the property. Complainant, in testifying regarding these letters, said that he did not tell the bank not to sell it and that his reason was that he thought Mr. Ford would not sell it at that time. On February 26th, 1926, the bank wrote complainant asking if he had a title policy on the land. On March 1st, complainant wrote the bank as follows:
"Referring to our telephone conversations, I desire to communicate with you before leaving the city, as I expect to be away several days.
"I again wish to say that I want to keep the property at Englewood, and will make other financial arrangements, if necessary, to make that possible. There are several reasons why it is imperative that I keep it, but also because this is not the proper time to sell. There has already been a marked rise in values and a very great advance in prices is sure to come in the near future."
The contract to sell to Kraus was made on February 27th, between the dates of these last two letters. From the reference to the telephone conversation and the statement that he wanted to keep the property, it seems certain that he knew the bank was proceeding to sell the property.
It was not until after the conveyance had been made to Kraus on April 17th, 1926, that the complainant for the first time took the stand that the bank had no right to sell the property. He had himself suggested a sale the previous October, at a price less than half that afterwards obtained, and later objected to a sale, not because of any lack of authority by the bank, but because he desired to keep it and because he expected an increase in value. On March 28th, 1926, complainant wrote the bank: *Page 263 
"I wanted to keep the property but I do not see why you embarrass me now when it is sold when you did not before. Will you please sent a statement so that I can figure out the net return on the property and know where I stand?"
The bank immediately sent him a statement giving him credit for the $2,000 received as a first payment on the sale and specifically notifying him that the property was sold for $20,000. On March 29th, 1926, complainant acknowledged receipt of this letter and statement. He said:
"I am unable to reconcile myself to the present situation. This property has a great potential value and I had no reason to believe you would sell it. I will consider it a favor if you will advise when the other payments are coming in and to whom selling, and I will try to go over the matter with Mr. Ford, with the hope that something can still be worked out."
He further said:
"It is in accord with my desire to satisfy you and gradually reduce my indebtedness that I have begun to decrease the size of the note."
This can mean nothing but acquiescence, for the decrease in the amount of the note consisted in the acceptance of the credit of the amount of the first payment on the sale. On March 30th, 1926, the bank wrote complainant notifying him that the purchaser of the property was Frank A. Kraus, and that complainant's note would be credited with $19,000 when all the credits were in on the sale. Complainant did not communicate with the bank until April 17th, 1926, the date when title was closed, and then only to ask if it was correct that title was to be closed on the 28th.
Up to this time complainant had never in any communication to the bank, questioned its right to sell. He had acquiesced in the sale by accepting the credit of the amount paid as the first payment on the sale, and had expressed his gratification that the amount of his note had been reduced.
The fact that the deed to Hammond was given to secure an indebtedness does not negative the right of the bank to sell, if such was the intention of the parties. By a deed *Page 264 
absolute on its face, complainant gave to the grantee at least an apparent right to sell. There was no written agreement containing a defeasance provision. Hammond testified that he was present and participated in a meeting between complainant and the president of the bank, and that it was agreed the complainant would have nothing to do with the property, the bank was to keep it and when it was sold the loan was to be credited. This is entirely consistent with the correspondence between complainant and the bank already referred to. I find it was the intention that the bank could sell, and that the conveyance to Kraus was valid.
It is well settled that a conveyance absolute on its face may be a mortgage, if such was the intention of the parties. Parole evidence is admissible to show what the actual intention was, but if a real sale was intended it takes effect according to its terms, even though a contemporaneous right or privilege to purchase back the property sold was contracted for. Papsco v.Novak, 94 N.J. Eq. 642.
In Clark v. Condit, 18 N.J. Eq. 358, it was held that an agreement given to the grantee of a deed, absolute on its face, authorizing the grantee to sell the property, was valid, and that the vendee under a deed executed by the power of sale received a valid title.
As to the defendant Kraus, the bill must be dismissed for the additional reason that no sufficient notice was given to him.
Complainant testified that on April 12th, he wrote to Kraus stating that he had just learned that Kraus had purchased the premises. He says that he had noticed that extensive building operations were in progress and that he desired to notify the purchaser that the property was his and that he had not granted permission to sell. Kraus denies that he ever received such a letter, which was addressed to another address than that of defendant. Complainant testified that in a telephone conversation with Kraus, Kraus admitted having received the letter. This also Kraus denied. In fact, complainant had known of the sale ever since March 1st, 1926, and had known that Kraus was the purchaser ever since April *Page 265 
1st, 1926. It will be noted that the complainant makes no statement as to what he now contends to be the true situation in regard to the property, but makes the bald statement that the property is his. It was not until April 26th, 1926, that complainant wrote the bank with the assertion that the sale was in direct violation of the agreement and without his consent.
Complainant also testified that he saw men at work on the property but said nothing to them.
According to the testimony of Smith, the real estate broker who had been in negotiations for the purchase of the property in October, 1925, these ended when complainant told the witness that he did not own the property and had nothing to do with it. Smith then checked up the record ownership of the property and thereby brought Kraus in touch with Hammond. I give credence to Smith's testimony, as complainant's expression of lack of interest in the sale is probably explained by the correspondence with the bank in which it refused to authorize this sale for $9,000. Complainant denies this conversation but I do not attach full weight to all his statements, since on numerous occasions at the hearing he made assertions at variance with his own letters. He stated that he had never had any trouble with his creditors. Yet in one of his letters he said his creditors were giving him an extension of time. In another letter he wrote the bank that he did not wish it to be known a payment was being made on his account at the bank. Numerous other statements of his seriously affected his credibility.
A decree will be advised dismissing the bill. *Page 266